Filed 1/8/20; Opinion following transfer from Supreme Court

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| VERA SEROVA, | B280526 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. BC548468) |
| v. | |
| SONY MUSIC ENTERTAINMENT et al., | |
| Defendants and Appellants. | |

APPEAL from an order of the Superior Court of Los Angeles County. Ann I. Jones, Judge. Affirmed in part and reversed in part with directions.

Katten Muchin Rosenman, Zia F. Modabber, Andrew J. Demko, Charlotte S. Wasserstein, Leah E. A. Solomon; Kinsella Weitzman Iser Kump & Aldisert, Howard Weitzman and Suann C. Macisaac for Defendants and Appellants.

Moss Bollinger, Jeremy F. Bollinger, Ari E. Moss and Dennis F. Moss for Plaintiff and Respondent.

_____

Defendants and appellants Sony Music Entertainment (Sony), John Branca, as co-executor of the estate of Michael J. Jackson (the Estate), and MJJ Productions, Inc. (collectively Appellants) appealed from an order of the superior court partially denying their motion to strike under the anti-SLAPP statute. (Code Civ. Proc., § 425.16.)[1]  We previously issued an opinion in this case holding that the claims of plaintiff and respondent Vera Serova (Serova) against Appellants should be struck under section 425.16.  (*Serova v. Sony Music Entertainment* (2018) 26 Cal.App.5th 759 (*Serova I*).)  Our Supreme Court granted review and subsequently transferred the case back to this court for reconsideration in light of the Supreme Court's decision in *FilmOn.com Inc. v. Double Verify Inc.* (2019) 7 Cal.5th 133 (*FilmOn*).

The case concerns allegations that Appellants misleadingly marketed a posthumous Michael Jackson album entitled simply "Michael."  Serova claims that the album cover and a promotional video wrongly represented that Jackson was the lead singer on each of the 10 vocal tracks on the album, when in fact he was not the lead singer on three of those tracks.  Serova alleged claims under the Unfair Competition Law (UCL; Bus.& Prof. Code, § 17200 et seq.) and the Consumers Legal Remedies Act (CLRA; Civ. Code, § 1750 et seq.).  Serova also brought a fraud claim against defendants Edward Joseph Cascio, James Victor Porte,

---

[1] Subsequent undesignated statutory references are to the Code of Civil Procedure.  "SLAPP" is an acronym for "[s]trategic lawsuit against public participation."  (*Briggs v. Eden Council for Hope & Opportunity* (1999) 19 Cal.4th 1106, 1109, fn. 1.)

and Cascio's production company, Angelikson Productions, LLC (collectively, the Cascio Defendants), alleging that those defendants knowingly misrepresented to Appellants that Jackson was the lead singer on the three tracks at issue (the Disputed Tracks).[2]

Our prior opinion held that: (1) Serova's claims against Appellants arose from conduct furthering Appellants' right of free speech "in connection with a public issue" under section 425.16, subdivision (e)(3) and (4); and (2) Serova did not show a probability that her claims under the UCL and the CLRA would succeed because the claims concern noncommercial speech that is not actionable under those statutes.

Upon reconsideration of these holdings in light of *FilmOn,* we conclude that our original opinion was correct. Consequently, we largely adopt that opinion, except that we have revised the discussion of the first step of the anti-SLAPP procedure in part 1 below to take account of the *FilmOn* decision and its application to the circumstances of this case.

*FilmOn* concerned only the first step of the anti-SLAPP analysis, i.e., whether particular claims arise from conduct that the anti-SLAPP statute protects. Specifically, *FilmOn* considered "whether the commercial nature of a defendant's speech is relevant in determining whether that speech merits protection" under section 425.16, subdivision (e)(4). (*FilmOn, supra,* 7 Cal.5th at p. 140.) The court concluded that the context of a statement—including "the identity of the speaker, the audience, and the purpose of the speech" —is "relevant, though not

---

[2] The Cascio Defendants are not parties to this appeal.

3

dispositive, in analyzing whether the statement was made 'in furtherance of' free speech 'in connection with' a public issue." (*Ibid.,* quoting § 425.16, subd. (e)(4).)

As we explained in our prior opinion, the representations that Serova challenges—that Michael Jackson was the lead singer on the three Disputed Tracks—did not simply promote sale of the album, but also stated a position on a disputed issue of public interest. Before the album was released, certain Jackson family members and others publicly claimed that Jackson was not the lead singer on the Disputed Tracks. Appellants disputed this claim. An attorney acting for the Estate released a public statement outlining the steps Appellants had taken to verify the authenticity of the tracks by consulting with experts and persons who were familiar with Jackson's voice and recordings.

Thus, the identity of the artist on the three Disputed Tracks was a controversial issue of interest to Michael Jackson fans and others who care about his musical legacy. By identifying the singer on the Disputed Tracks as Michael Jackson, Appellants' challenged statements made a direct claim about the controversy itself. The statements were made publicly to an audience—potential purchasers of the album—that was likely to have an interest in the identity of the singer. And, although Appellants' ultimate goal was presumably to sell albums by marketing songs sung by Michael Jackson, that goal did not make the controversy over the identity of the artist any less real or important to those who cared about the issue. The challenged statements furthered Appellants' position on the controversy by articulating a consistent and unqualified belief in the identity of the artist. Appellants' challenged statements were

4

therefore sufficiently connected to an issue of public interest to warrant anti-SLAPP protection.

Our Supreme Court's decision in *FilmOn* did not address the second step of the anti-SLAPP analysis, which concerns the merits of a plaintiff's claims. Nor did it address the criteria for identifying commercial and noncommercial speech under the First Amendment. That issue was the focus of our prior ruling that the speech that Serova challenges was outside the scope of the consumer protection laws on which her claims are based. Thus, we have no reason to reconsider our prior ruling on the second step of the anti-SLAPP procedure, which we reproduce (with minor changes) in part 2 below.

## BACKGROUND

### 1.     *The Anti-SLAPP Procedure*

Section 425.16 provides for a "special motion to strike" when a plaintiff asserts claims against a person "arising from any act of that person in furtherance of the person's right of petition or free speech under the United States Constitution or the California Constitution in connection with a public issue." (§ 425.16, subd. (b)(1).) Such claims must be stricken "unless the court determines that the plaintiff has established that there is a probability that the plaintiff will prevail on the claim." (*Ibid*.)

Thus, ruling on an anti-SLAPP motion involves a two-step procedure. First, the moving defendant must show that the challenged claims arise from protected activity. (*Baral v. Schnitt* (2016) 1 Cal.5th 376, 396 (*Baral*); *Rusheen v. Cohen* (2006) 37 Cal.4th 1048, 1056.) Second, if the defendant makes such a showing, the "burden shifts to the plaintiff to demonstrate that each challenged claim based on protected activity is legally sufficient and factually substantiated." (*Baral*, at p. 396.)

5

Without resolving evidentiary conflicts, the court determines "whether the plaintiff's showing, if accepted by the trier of fact, would be sufficient to sustain a favorable judgment." (*Ibid.*)

Section 425.16, subdivision (e) defines the categories of acts that are in " 'furtherance of a person's right of petition or free speech.' " Those categories include "any written or oral statement or writing made in a place open to the public or a public forum in connection with an issue of public interest," and "any other conduct in furtherance of the exercise of the constitutional right of petition or the constitutional right of free speech in connection with a public issue or an issue of public interest." (§ 425.16, subd. (e)(3) & (4).)

In 2003 the Legislature enacted section 425.17 to curb "a disturbing abuse of Section 425.16 . . . which has undermined the exercise of the constitutional rights of freedom of speech and petition for the redress of grievances, contrary to the purpose and intent of Section 425.16." (§ 425.17, subd. (a).) Section 425.17 seeks to accomplish that goal by expressly excluding several categories of claims from the scope of section 425.16.

Section 425.17, subdivision (c) establishes such an exclusion for claims concerning some commercial speech. That subdivision provides that section 425.16 does not apply to "any cause of action brought against a person primarily engaged in the business of selling or leasing goods or services" if certain conditions exist, including that: (1) the statement at issue "consists of representations of fact about that person's or a business competitor's business operations, goods, or services" that was made to promote commercial transactions or was made "in the course of delivering the person's goods or services"; and (2) the intended audience is an actual or potential customer or a

6

person likely to influence a customer.  (§ 425.17, subd. (c)(1) & (2).)

Section 425.17 contains certain specifically defined exceptions.  One of those exceptions states that the commercial speech provision in section 425.17, subdivision (c) does not apply to "[a]ny action against any person or entity based upon the creation, dissemination, exhibition, advertisement, or other similar promotion of any dramatic, literary, musical, political, or artistic work."  (§ 425.17, subd. (d)(2).)

## 2.    *Serova's Allegations*[3]

The album "Michael" was released on or about December 14, 2010, about 18 months after Michael Jackson's death.  Sony released the album in conjunction with the Estate.

The album contained 10 songs.  Serova alleges that the three songs on the Disputed Tracks—"Breaking News," "Monster," and "Keep Your Head Up" (the Songs)—have been controversial "[s]ince *Michael's* inception."

Serova claims that the Cascio Defendants recorded the initial versions of the Disputed Tracks and had "exclusive knowledge" that the lead vocals for the Songs were actually performed by a singer other than Michael Jackson.  Serova alleges that Cascio then falsely represented to Appellants that Michael Jackson was the singer.

---

[3] As explained below, the trial court ruled on Appellant's anti-SLAPP motion based upon the allegations in Serova's first amended complaint (Complaint) and a stipulation that established certain background facts for purposes of the motion only.  Thus, the relevant facts are primarily those alleged in the Complaint.

7

Prior to "Michael's" release, various members of Michael Jackson's family and others familiar with his recordings disputed whether he was the lead singer on the Disputed Tracks. In response to those concerns, Sony and the Estate (through Attorney Howard Weitzman) both publicly issued statements confirming their belief that Jackson was the singer.

In his statement (the Weitzman Statement), Weitzman explained that many persons who were familiar with Jackson's work had confirmed that he was the lead singer on the Disputed Tracks, including former producers, engineers, performers, and directors who had worked with Jackson. He stated that the Estate and Sony had also retained forensic musicologists who examined the Disputed Tracks and concluded that the lead singer was actually Jackson. He also stated that he had spoken to the singer whom some persons had "wrongfully alleged was a 'soundalike' singer that was hired to sing" on the Disputed Tracks, and that the singer had denied any involvement with the project. Weitzman explained that, "given the overwhelming objective evidence resulting from the exhaustive investigations," Sony decided to include the Disputed Tracks on the album "because they believed, without reservation, that the lead vocal[s] on all of those tracks were sung by Michael Jackson."

The album cover for "Michael" (Album Cover) included a statement that " '[t]his album contains 9 previously unreleased vocal tracks performed by Michael Jackson.' "[4] A video released before the album (the Promotional Video) described "Michael" as

---

[4] One of the tracks on the album had been previously recorded.

" 'a brand new album from the greatest artist of all time.' " While appearing on the *Oprah Winfrey* show, Cascio also stated that Jackson performed the lead vocals on the Disputed Tracks.

The Complaint alleges that the lead singer on the Disputed Tracks actually sounds like the "soundalike" singer mentioned in the Weitzman Statement. Serova claims she discovered evidence indicating that the lead singer on the Disputed Tracks was not Michael Jackson. Among other things, she claims that: (1) Cascio did not produce any "demos, outtakes, alternate takes, and multi-track recordings" when requested; (2) Jackson never mentioned that he had recorded the Songs; (3) the Songs did not appear on a list of ongoing or planned projects found in Michael Jackson's house after his death; and (4) various persons that the Weitzman Statement said had confirmed that the lead singer on the Disputed Tracks was Jackson in fact had doubts about that conclusion.

Serova also hired an audio expert who prepared a report concluding that Michael Jackson "very likely did not sing" the lead vocals on the Disputed Tracks. The report was peer-reviewed by another expert who concluded that the study's "methodologies and conclusions were reasonable."

The Complaint alleges claims against all defendants under the CLRA and UCL, and asserts a fraud claim against the Cascio Defendants only. The Complaint claims that thousands of putative class members purchased "Michael" and lost "money or property" as a result of the alleged misleading representations.

3. ***Appellants' Anti-SLAPP Motion***

Appellants and the Cascio Defendants filed motions to strike under section 425.16. Appellants argued that Serova's claims arose from protected speech under prong one of the anti-

9

SLAPP procedure. With respect to prong two, Appellants argued that Serova could not succeed on her claims against them because their challenged statements about the identity of the lead singer on the Disputed Tracks were noncommercial speech as a matter of law and no reasonable consumer could find the statements misleading.

To permit a ruling on the anti-SLAPP motions in advance of discovery, the parties stipulated that, "solely for purposes of this determination on the Motions," Michael Jackson did not sing the lead vocals on the three Disputed Tracks (the Stipulation). The parties also stipulated to the authenticity of copies of the Weitzman Statement, the Album Cover, and the Promotional Video.

The trial court granted the defendants' motions with respect to allegations concerning the Weitzman Statement and Cascio's statement on the *Oprah Winfrey* show, but denied the motions with respect to allegations concerning statements on the Album Cover and in the Promotional Video.

Under prong one of the anti-SLAPP procedure, the trial court ruled that all the statements addressed in the defendants' motions arose from conduct in furtherance of the defendants' right of free speech concerning an issue of public interest. The court concluded that the Weitzman Statement was "made in a public forum about a matter of public interest." The court reasoned that the Weitzman Statement "responded to a matter of public concern, i.e., the authenticity of certain recordings released posthumously and claimed to have been written and recorded by a pop superstar." Similarly, the court concluded that Cascio's statement on the *Oprah Winfrey* show addressed "the same controversy."

In contrast, the trial court concluded that the Album Cover and the Promotional Video were simply promotional materials that "did not speak to the controversy surrounding the performance [or] address or refute" the allegations concerning the Disputed Tracks. The court nevertheless found that statements on the Album Cover and in the Promotional Video arose from protected conduct because "Michael Jackson's professional standing and accomplishments created legitimate and widespread attention to the release of a new album."

With respect to prong two, the trial court found that the Weitzman Statement and Cascio's statements on the *Oprah Winfrey* show were noncommercial speech. The court concluded that those statements were not made to promote or sell the album, but addressed "a controversy regarding the veracity of the claims surrounding the release of the album."

However, the court concluded that the challenged statements on the Album Cover and in the Promotional Video were advertisements constituting commercial speech. The court rejected the defendants' argument that this speech was "inextricably intertwined" with the Songs themselves under *Riley v. National Federation of Blind* (1988) 487 U.S. 781, 796 (*Riley*). The court reasoned that "[n]othing in this case prevented Defendants from giving the album a different title and look or from electing not to attest to the authenticity of the recordings on the cover or in a commercial."

The court also found that, assuming (pursuant to the parties' Stipulation) that Michael Jackson was not actually the lead singer on the Disputed Tracks, both the Album Cover and the Promotional Video were likely to deceive a reasonable consumer. The court concluded that images of Michael Jackson

11

and the challenged statements on the Album Cover, along with the lack of any attribution to others, conveyed the message that Jackson was the lead singer on the Disputed Tracks. The court also concluded that a reasonable consumer would believe that Michael Jackson was the "artist" referenced in the statement on the Promotional Video that "Michael" was " 'a brand new album from the greatest artist of all time.' "

## DISCUSSION

Appellants challenge the trial court's rulings that: (1) the Promotional Video and the Album Cover were commercial speech that may be subject to claims under the UCL and CLRA; and (2) the representations in those materials were likely to deceive a reasonable consumer. Serova argues that those rulings were correct, and also asserts as an alternative ground for affirmance that her claims do not "arise from" protected free speech activity under prong one of the anti-SLAPP procedure. (See *Klem v. Access Ins. Co.* (2017) 17 Cal.App.5th 595, 609 ["A prevailing party on an anti-SLAPP motion need not file a cross-appeal to preserve his disagreement with the trial court's reasoning"].)[5]

We apply a de novo standard of review to the trial court's rulings on the anti-SLAPP motion. (*Soukup v. Law Offices of Herbert Hafif* (2006) 39 Cal.4th 260, 269, fn. 3.)

_____

[5] Serova did not appeal from the trial court's ruling granting the defendants' anti-SLAPP motion with respect to the Weitzman e-mail and Cascio's statement during the *Oprah Winfrey* interview. Thus, the only claims at issue in this appeal concern the representations in the Promotional Video and the Album Cover (the Challenged Statements).

12

1. **Serova's Claims Concerning the Promotional Video and the Album Cover Arise from Appellants' Right of Free Speech Under the United States and California Constitutions**

Appellants claim the trial court correctly concluded that Serova's claims arose from protected speech concerning an issue of public interest, but also suggest that we need not reach that issue. Appellants argue that the Legislature's decision to create an exception for the marketing of musical works under section 425.17, subdivision (d)(2) shows a legislative intent that such speech "is eligible for anti-SLAPP protection," which is "essentially dispositive of step one of the anti-SLAPP analysis." We first consider that argument.

a. *The significance of the Legislature's exclusion of music advertisements from the scope of section 425.17*

As mentioned, section 425.17, subdivision (d)(2) provides that the "creation, dissemination, exhibition, advertisement, or other similar promotion of any dramatic, literary, musical, political, or artistic work" is outside the scope of the commercial speech provision in section 425.17, subdivision (c). The exception in section 425.17, subdivision (d)(2) certainly means that the promotion of a musical work is not included within the categories of conduct that the Legislature specifically stated were not subject to anti-SLAPP relief. However, the Legislature's decision to *exclude* the advertising of musical works from section 425.17 does not mean that it also intended to afford anti-SLAPP protection to such conduct in every circumstance, regardless of the requirements of section 425.16.

Such a conclusion would be inconsistent with the Legislature's stated intent.  The Legislature specifically stated that it enacted section 425.17 to curb *abuses* of the anti-SLAPP law that were "contrary to the purpose and intent of Section 425.16."  (§ 425.17, subd. (a).)  That statement suggests that our Legislature was concerned that the courts were granting too broad a reading to what constitutes "protected" conduct under section 425.16, subdivision (e).  Appellants' argument, if accepted, would commit that very same sin because it would require courts to treat the types of speech delineated in section 425.17, subdivision (d)(2) as subject to the anti-SLAPP law without any showing that such speech meets the definition of "protected" conduct under section 425.16, subdivision (e).

The interpretation that Appellants suggest would also be inconsistent with the definitions of protected conduct under section 425.16.  Section 425.16, subdivision (e)(3) and (4) each require that protected conduct must have some connection to a "public issue" or an "issue of public interest."  Appellants' interpretation of section 425.17, subdivision (d)(2) ignores that requirement.  For example, an action challenging an advertisement falsely claiming that a musical album contains a particular song would be an action "based upon the . . . advertisement" of a musical work.  (§ 425.17, subd. (d)(2).)  Appellants do not provide any reason to believe that the Legislature intended to provide automatic anti-SLAPP protection to such a mundane commercial misrepresentation simply because the statement was made in connection with the advertisement of a musical work.

Ignoring the public interest requirement in defining the conduct that is protected under section 425.16, subdivision (e)(3)

14

and (4) would also be directly contrary to our Supreme Court's opinion in *FilmOn*. As discussed further below, the court in *FilmOn* confirmed the need for a party moving for anti-SLAPP relief to show a relationship between the challenged speech "and the public conversation about some matter of public interest." (*FilmOn, supra,* 7 Cal.5th at pp. 149–150.)[6]

The court in *Dyer v. Childress* (2007) 147 Cal.App.4th 1273 rejected an argument similar to the one that Appellants make

---

[6] The court in *FilmOn* addressed the scope of section 425.17, subdivision (c) in rejecting the argument that, in identifying protected conduct, the commercial context of a challenged statement was relevant only under that section. (*FilmOn, supra,* 7 Cal.5th at pp. 146–149.) Although the court did not consider the significance of the exclusion in section 425,17, subdivision (d)(2), its analysis is consistent with our understanding of that subdivision. The court explained that not all commercial speech is included within the anti-SLAPP exemption that section 425.17, subdivision (c) defines. For commercial speech not included in that subdivision, "[l]ike all other statements that do not fall within the scope of an exemption, such statements are *eligible* for anti-SLAPP protection under section 425.16." (*FilmOn*, at p. 148, italics added.) The court did not suggest that commercial statements not included in section 425.17 are *automatically* entitled to anti-SLAPP protection under section 425.16. Indeed, the court clearly held that the context of such statements must be considered to determine if they are sufficiently connected to an issue of public interest to warrant protection under section 425.16, subdivision (e)(4). (*FilmOn*, at p. 148.) Similarly, conduct excluded from section 425.17, subdivision (c) under section 425.17, subdivision (d)(2) is not automatically entitled to anti-SLAPP protection without any consideration of context.

15

here. After reviewing the legislative history concerning section 425.17, subdivision (d)(2), the court rejected the defendant's claim that "by expressly exempting motion pictures from the anti-SLAPP limitations imposed in section 425.17, subdivisions (b) and (c), the Legislature acknowledged that motion pictures are more deserving of protection than other forms of expression not enumerated." (*Dyer*, at pp. 1283–1284.) The court concluded that "[t]he exclusion of motion pictures from the exemptions to the limitations set forth in section 425.17, subdivisions (b) and (c) means only that anti-SLAPP motions remain available to defendants who are creators and distributors of motion pictures . . . . [¶] The exception of section 425.17, subdivision (d)(2) *does not eliminate the need to show significant public interest in the conduct at the heart of the plaintiff's complaint* or expand the scope of the anti-SLAPP law to provide protection to motion picture defendants in every context." (*Dyer*, at p. 1284.)

Similarly, the exception of section 425.17, subdivision (d)(2) does not provide anti-SLAPP protection to sellers of music in every context. At most, the Legislature's exclusion of the promotion of "dramatic, literary, musical, political, or artistic work" from the scope of commercial activity covered by section 425.17, subdivision (c) means that courts should be particularly sensitive to the constitutional free speech aspects of such work in analyzing whether particular statements or conduct are protected under section 425.16.[7]

---

[7] For example, as discussed below, in this case the identity of the singer on the Disputed Tracks greatly affects the artistic significance of the music on those tracks. The music is of course constitutionally protected expression. In analyzing context under

16

We therefore consider whether Appellants' Challenged Statements were made "in connection with a public issue or an issue of public interest." (§ 425.16, subd. (e).)  In so doing, we pay particular attention to the context of those statements as instructed by the court in *FilmOn.*

### b. *The challenged promotional statements in this case*

In *FilmOn* our Supreme Court held that, "within the framework of section 425.16, subdivision (e)(4), a court must consider the context as well [as] the content of a statement in determining whether that statement furthers the exercise of constitutional speech rights in connection with a matter of public interest." (*FilmOn, supra,* 7 Cal.5th at p. 149.)[8]  That case concerned alleged disparaging statements about the Web-based entertainment programming distributed by the plaintiff, FilmOn.com Inc. (FilmOn.com).  The defendant, DoubleVerify Inc. (DoubleVerify), provided confidential reports to its paying clients classifying FilmOn.com Web sites under categories of sites

---

section 425.16, it is appropriate to consider the relationship between the Challenged Statements promoting "Michael" and the expressive content of the album itself.

[8] *FilmOn* concerned the definition of protected conduct under section 425.16, subdivision (e)(4).  (*FilmOn, supra,* 7 Cal.5th at pp. 139–140.)  However, the requirement that a statement be "in connection with an issue of public interest" is also present in subdivision (e)(3).  (§ 425.16, subd. (e)(3).)  The court's analysis of the importance of context in determining whether such a connection exists therefore appears equally applicable to section 425.16, subdivision (e)(3).

17

that engage in copyright infringement and contain "adult content." (*Id.* at pp. 140–142.) The court held that these reports were not " 'in connection with' " an issue of public interest. (*Id.* at p. 154.) In doing so, the court relied on the context of the reports, which it characterized as "two well-funded for-profit entities engaged in a private dispute over one's characterization—in a confidential report—of the other's business practices." (*Ibid.*)

Before reaching this conclusion, the court explained the appropriate process for determining whether challenged speech has a sufficient connection to a public issue to warrant anti-SLAPP protection. "First, we ask what 'public issue or . . . issue of public interest' the speech in question implicates—a question we answer by looking to the content of the speech. (§ 425.16, subd. (e)(4).) Second, we ask what functional relationship exists between the speech and the public conversation about some matter of public interest. It is at the latter stage that context proves useful." (*FilmOn, supra,* 7 Cal.5th at pp. 149–150.) Context includes the identity of the speaker, the audience, and the purpose of the speech. (*Id.* at pp. 142–143, 145.)

In analyzing the relationship between the challenged speech and the issue of public interest, it is " 'not enough that the statement refer to a subject of widespread public interest; the statement must in some manner itself contribute to the public debate." (*FilmOn, supra,* 7 Cal.5th at p. 150.) A defendant has contributed to the public debate if he or she "participated in, or furthered, the discourse that makes an issue one of public interest." (*Id.* at p. 151.)

### i.   *The issue of public interest*

*FilmOn* did not announce any change in the approach that courts should take to identifying issues of public interest. On the

18

contrary, the court said that the Courts of Appeal have "ably distilled the characteristics of a 'public issue or an issue of public interest' " for purposes of section 425.16, subdivision (e)(4). (*FilmOn, supra,* 7 Cal.5th at p. 149.) In particular, the court cited with approval the definition of an issue of public interest in *Rivero v. American Federation of State, County, and Municipal Employees, AFL-CIO* (2003) 105 Cal.App.4th 913, 919–924 (*Rivero*), and in *Weinberg v. Feisel* (2003) 110 Cal.App.4th 1122, 1132–1133 (*Weinberg*).

In *Rivero*, the court surveyed a number of cases and identified three common elements in statements that concerned an issue of public interest. The statements concerned either: (1) a person or entity "in the public eye"; (2) conduct that "could directly affect a large number of people beyond the direct participants"; or (3) a "topic of widespread, public interest." (*Rivero, supra,* 105 Cal.App.4th at p. 924.) In *Weinberg*, the court offered additional analysis consistent with the categories in *Rivero*. Among other things, the court explained that public interest "does not equate with mere curiosity" and that a matter of public interest should be of concern to a substantial number of people rather than just to a "relatively small, specific audience." (*Weinberg, supra,* 110 Cal.App.4th at p. 1132.) In addition, a "person cannot turn otherwise private information into a matter of public interest simply by communicating it to a large number of people." (*Id.* at pp. 1132–1133.)

The issue of public interest here is whether Michael Jackson was in fact the singer on the three Disputed Tracks. It is beyond dispute that Michael Jackson was a famous entertainer who was very much "in the public eye." (*Rivero, supra,* 105 Cal.App.4th at p. 924.) As the court stated in *Stewart v. Rolling*

19

*Stone LLC* (2010) 181 Cal.App.4th 664 (*Stewart*), " ' "there is a public interest which attaches to people who, by their accomplishments, mode of living, professional standing or calling, create a legitimate and widespread attention to their activities." ' " (*Id.* at pp. 677–678, quoting *Eastwood v. Superior Court* (1983) 149 Cal.App.3d 409, 422; see *No Doubt v. Activision Publishing, Inc.* (2011) 192 Cal.App.4th 1018, 1027 [video game distributor's use of band members' likenesses in a video game was a "matter of public interest because of the widespread fame" of the band]; *Hall v. Time Warner, Inc.* (2007) 153 Cal.App.4th 1337, 1347 [Marlon Brando's decisions concerning the distribution of his assets was an issue of public interest].)

Moreover, the question whether Michael Jackson was the singer on the Disputed Tracks did not simply concern some trivial fact about his life, but related to his artistic legacy. Facts concerning the creation of works of art and entertainment can themselves be issues of public interest. For example, in *Kronemyer v. Internet Movie Database Inc.* (2007) 150 Cal.App.4th 941, the plaintiff challenged the omission of his name from the credits listed for the movie My Big Fat Greek Wedding on a widely visited Web site. (*Id.* at p. 944.) The court concluded that the movie "was a topic of widespread public interest," and the Web site was a public forum. (*Id.* at pp. 949–950.) Accordingly, the plaintiff's action challenging the listings was "within the ambit of section 425.16, subdivision (e)(3) and (4)." (*Id.* at p. 950; see *Tamkin v. CBS Broadcasting, Inc.* (2011) 193 Cal.App.4th 133, 143–144 [there was a "public interest in the writing, casting and broadcasting" of a television episode for purposes of the anti-SLAPP statute].)

The controversy over the identity of the singer on the Disputed Tracks was also of widespread interest among Michael Jackson fans. (See *Rivero, supra,* 105 Cal.App.4th at p. 924; *Weinberg, supra,* 110 Cal.App.4th at p. 1132.) The Complaint alleges that, "[b]efore *Michael's* release, numerous people familiar with Michael Jackson's voice disputed the authenticity" of the Disputed Tracks. As discussed above, Sony and the Estate released public statements in response, including the detailed Weitzman Statement. Serova further alleges that, "[s]ince *Michael's* inception, controversy has surrounded three of the album's ten songs."

This public controversy distinguishes this case from cases that Serova cites concerning allegedly misleading descriptions of a particular commercial product or service. (See *Consumer Justice Center v. Trimedica International, Inc.* (2003) 107 Cal.App.4th 595, 599, 601 [claims about a pill for breast enlargement]; *Nagel v. Twin Laboratories, Inc.* (2003) 109 Cal.App.4th 39, 43–46 [list of ingredients on labels for nutritional and dietary supplements]; *Scott v. Metabolife Internat., Inc.* (2004) 115 Cal.App.4th 404, 423 [claims about the safety and efficacy of a particular weight loss product]; *L.A. Taxi Cooperative, Inc. v. The Independent Taxi Owners Assn. of Los Angeles* (2015) 239 Cal.App.4th 918, 921, 927–928 [alleged misleading advertisements concerning contact information for companies providing taxi services]; *Jewett v. Capital One Bank* (2003) 113 Cal.App.4th 805, 814–816 [alleged false statements in credit card solicitations].)

The representations at issue here concerned the body of work of a well-known artist and an album containing his songs that generated significant public attention. We therefore

21

conclude that the issue was one of "public interest" for purposes of section 425.16, subdivision (e)(3) and (4).

>    **ii.** *The relationship between the Challenged Statements and the public debate*

As discussed above, the court in *FilmOn* explained that courts considering whether challenged speech concerned an issue of public interest should analyze not only the nature of the issue but also the *connection* between the issue and the speech. In the latter analysis, the context of the speech—the speaker, audience and purpose—are important.

We discussed the context of the Challenged Statements at some length in our prior opinion in analyzing whether those statements can be categorized as actionable commercial speech for purposes of the second step of the anti-SLAPP procedure. (*Serova I, supra*, 26 Cal.App.5th at pp. 775–781.) Much of that analysis is also relevant to the connection between the statements that Serova challenges and the issue of public interest for purposes of the first step in the anti-SLAPP analysis.

As we previously explained (and reiterate below), the speaker and the audience for the Challenged Statements suggest a commercial purpose.[9] Appellants are sellers of the album, and the audience for the statements was potential purchasers.

However, the court in *FilmOn* explained that " '[w]hether speech has a commercial or promotional aspect is not dispositive'

---

[9] However, we also hold that the *content* of the statements shows that they were not merely commercial speech for purposes of determining whether Serova has shown a probability of success on her consumer protection claims under the second step of the anti-SLAPP analysis.

of whether it is made in connection with an issue of public interest." (*FilmOn, supra,* 7 Cal.5th at p. 154, quoting *Industrial Waste & Debris Service, Inc. v. Murphy* (2016) 4 Cal.App.5th 1135, 1150.)  The court stated unequivocally that "[s]ome commercially oriented speech will, in fact, merit anti-SLAPP protection." (*FilmOn*, at p. 153.)  The proper analysis focuses on the same "contextual cues" that show a statement "to be 'commercial' in nature—whether it was private or public, to whom it was said, and for what purpose." (*Id.* at p. 148.)  The ultimate question is whether the "wedding of content and context" shows that the statement "contributes to or furthers the public conversation on an issue of public interest." (*Id.* at p. 154.)

Analysis of the content and context of the Challenged Statements here shows that they merit anti-SLAPP protection.

### (a)  *Content*

The content of the Challenged Statements related directly to the issue of public interest.  According to Serova's Complaint, the statements identified Michael Jackson as the singer on the Disputed Tracks, which was the precise focus of the public controversy.  Thus, the statements at issue here were not just tangentially connected to the issue of public interest through a creative generalization of their subject matter (what the court in *FilmOn* characterized as the " 'synedoche theory' of public interest"). (*FilmOn, supra,* 7 Cal.5th at p. 152; see *Commonwealth Energy Corp. v. Investor Data Exchange, Inc.* (2003) 110 Cal.App.4th 26, 34 ["The part is not synonymous with the whole.  Selling an herbal breast enlargement product is not a disquisition on alternative medicine"].)

In her supplemental brief, Serova disputes that there was *any* connection between the Challenged Statements and the issue

of public interest, claiming that the statements did not refer to the identity of the singer on the Disputed Tracks at all. She argues that the Challenged Statements "do not reference the three controversial songs and do not suggest to the audience that these three songs are somehow special."

Serova's argument ignores her own allegations, which she may not do. Her complaint alleges that the Challenged Statements are among those that "expressly and impliedly represented that the lead vocals on all of the tracks of the album were performed by Michael Jackson." Indeed, absent such an allegation of deceptive conduct, Serova would not have any basis for a consumer protection claim concerning the Challenged Statements.

The question in the first step of the anti-SLAPP analysis is whether the *claims* at issue arise from protected conduct. (§ 425.16, subd. (b)(1); *Baral, supra,* 1 Cal.5th at p. 396.) A plaintiff's complaint of course defines his or her claims, and can itself show that the claims arise from protected conduct. (See *Bel Air Internet, LLC v. Morales* (2018) 20 Cal.App.5th 924, 936–937.) Serova cannot contradict her own allegations in arguing that the Challenged Statements did not identify the singer on the Disputed Tracks as Michael Jackson. (*Ibid.*)

It is true that the statements on the Album Cover and the Promotional Video did not actually refer to the public debate about the identity of the singer. And, unlike the Weitzman Statement, they did not offer any argument in support of the conclusion that Michael Jackson was the singer. They simply asserted the conclusion as fact. But they certainly showed Appellants' acceptance of that fact, which communicated Appellants' position on the issue. As Serova acknowledges, a

24

statement "need not necessarily reference the debate to participate in it."  Whether couched as argument or fact, the Challenged Statements expressed a position on the question whether Michael Jackson was the singer on the Disputed Tracks.

Serova also argues that "nothing about Jackson's persona, life or career is communicated by the advertisements" at issue. This assumes that the content of Jackson's body of work is irrelevant to those interested in his life and career.  The assumption is unreasonable on its face, and belied in any event by Serova's own allegations, which acknowledge the public controversy over the identity of the singer.

### (b) *Context*

As discussed above, the commercial purpose of the Challenged Statements—to sell albums—does not itself determine whether they contributed to the public debate.  It certainly reflects that Appellants had a commercial interest in the debate, but it does not divorce the statements from that debate.  Appellants had the same commercial interest in defending their claims about the identity of the singer in the Weitzman Statement, which Serova does not dispute was protected speech.  The purpose of the Challenged Statements is essentially a neutral consideration in determining whether the statements were protected conduct.

On the other hand, the identity of the speaker and the audience both support the conclusion that the Challenged Statements contributed to the "public conversation" on an issue of public interest.  (*FilmOn, supra,* 7 Cal.5th at p. 154.)  Unlike the speech at issue in *FilmOn,* the Challenged Statements here were *public.*  The Album Cover and the Promotional Video were available to those who were interested.  And the audience for

25

those statements—persons who might buy the album—was also an audience that was highly likely to be interested in the identity of the singer on the Disputed Tracks.  The relevant point here is not, as Serova argues, whether the Challenged Statements reached *everyone* who was interested in the controversy over the identity of the singer.  The point is that Appellants made the statements publicly to a sizeable audience that was likely to be interested in the issue.

There is another important fact concerning the identity of the speakers here.  Appellants were not sellers of a typical consumer product; they were sellers of a product (music) that is itself subject to First Amendment protection.  In explaining that the identity of the speaker matters in analyzing context, the court in *FilmOn* cited as an example the identity of the defendants in *San Diegans for Open Government v. San Diego State University Research Foundation* (2017) 13 Cal.App.5th 76 (*San Diegans*).  (*FilmOn, supra,* 7 Cal.5th at p. 145.)  In *San Diegans,* the plaintiff claimed that contracts for collaborative news reporting between a defendant, inewsource, and a public radio and television station, KPBS, violated prohibitions on self-dealing and gifts of public funds.  (*San Diegans,* at p. 103.)  In holding that the claims arose from protected speech activity, the court observed that "the fact these contracts are for gathering and delivering news stories and not some other purpose matters." (*Id.* at p. 105.)  The court explained that inewsource "is not a construction company.  It is in the news reporting business, and the contracts [the plaintiff] challenges shape the way inewsource and KPBS gather, produce, and report the news."  (*Id.* at p. 106.)

Similarly, the challenged conduct in this case helped shape the experience of the music that consumers purchased.  There is

no dispute that the identity of the singer on the Disputed Tracks affected the musical experience for many listeners; indeed, the basis for Serova's Complaint is that whether the singer was Michael Jackson mattered to consumers.

Moreover, in *FilmOn,* the court instructed that courts should undertake the analysis of context mindful of the anti-SLAPP statute's purpose to "encourage continued participation in matters of public significance." (*FilmOn, supra,* 7 Cal.5th at p. 154, quoting § 425.16, subd. (a).) Giving too much weight to the commercial context of the Challenged Statements here risks unduly curtailing protected expression. Without anti-SLAPP protection for their statements on the Album Cover and Promotional Video, Appellants might simply have decided not to sell the Disputed Tracks at all. Others in their situation might similarly decide not to include songs or other artistic works with disputed provenance in a collection offered for sale rather than either (1) risk the expense of consumer litigation, or (2) dilute their marketing by acknowledging doubts about the provenance of the work that they do not share. That result would discourage, rather than encourage, protected speech.

We therefore conclude that, consistent with the analysis and holding in *FilmOn*, Appellants' Challenged Statements on the Album Cover and the Promotional Video were protected speech under section 425.16, subdivision (e)(3) and (4).

2. **The Challenged Statements Were Noncommercial Speech Outside the Scope of Serova's Consumer Protection Claims**

Appellants argue that Serova cannot show a probability of success on her UCL and CLRA claims under prong two of the anti-SLAPP analysis because those statutes apply only to

commercial speech. They claim that their Challenged Statements about the lead singer on the Disputed Tracks were not commercial speech, or, if they were, that those statements were inextricably intertwined with the protected contents of the Songs themselves.

Appellants argue that the consumer protection claims that Serova asserts against them apply only to commercial speech. A number of cases support that assertion. (See *Kasky v. Nike, Inc.* (2002) 27 Cal.4th 939, 952 (*Kasky*) [identifying criteria for determining whether speech may constitutionally be regulated as commercial speech under California's false advertising laws]; *Rezec v. Sony Pictures Entertainment, Inc.* (2004) 116 Cal.App.4th 135, 140 (*Rezec*) [California's consumer protection laws, like the unfair competition law, govern only *commercial* speech]; *Keimer v. Buena Vista Books, Inc.* (1999) 75 Cal.App.4th 1220, 1231 (*Keimer*) [Bus. & Prof. Code, §§ 17200 et seq. and 17500 et seq. do not "seek to restrict noncommercial speech in any manner"]; *O'Connor v. Superior Court* (1986) 177 Cal.App.3d 1013, 1019.) Serova does not dispute this. Moreover, she did not argue below and does not argue on appeal that Appellants' Challenged Statements are actionable even if they are noncommercial speech. Thus, if Appellant's Challenged Statements are noncommercial speech, Serova's claims against them must be stricken.

a.    *Identifying commercial speech*

Restrictions on purely commercial speech are subject to a lesser level of scrutiny than are " 'other constitutionally safeguarded forms of expression.' " (*Kasky, supra,* 27 Cal.4th at p. 952, quoting *Bolger v. Youngs Drug Products Corp.* (1983) 463 U.S. 60, 64–65 (*Bolger*).) Moreover, "commercial speech that is

28

false or misleading is not entitled to First Amendment protection and 'may be prohibited entirely.' " (*Kasky,* at p. 953, quoting *In re R. M. J.* (1982) 455 U.S. 191, 203.)

The United States Supreme Court first held that commercial speech is entitled to some constitutional protection in *Bigelow v. Virginia* (1975) 421 U.S. 809. In *Bigelow*, the court rejected the proposition that "advertising, as such, was entitled to no First Amendment protection." (*Id.* at p. 825.) Following that decision, courts have had to grapple with the distinction between expressive activities that are merely commercial in nature and those that are subject to more stringent First Amendment protection.

In *Bolger*, the court held that materials distributed by a manufacturer of contraceptives, including both promotional flyers and informational pamphlets about contraceptives, were commercial speech. (*Bolger*, *supra*, 463 U.S. at pp. 62, 66–68.) Most of the mailings at issue fell "within the core notion of commercial speech—'speech which does "no more than propose a commercial transaction." ' " (*Id.* at p. 66, quoting *Va. Pharmacy Bd. v. Va. Consumer Council* (1976) 425 U.S. 748, 762 (*Virginia Pharmacy*).) However, the informational pamphlets required further analysis. The court identified three factors indicating that the pamphlets were commercial speech: (1) the pamphlets were "conceded to be advertisements"; (2) they referred to a specific product; and (3) the defendant had an economic motivation for mailing them. (*Bolger*, at pp. 66–67.) The court stated that none of these factors alone was sufficient to show that the speech was commercial, but "[t]he combination of *all* these characteristics . . . provides strong support" for the decision that

29

the informational pamphlets were commercial speech. (*Id.* at p. 67.)

In *Kasky, supra,* 27 Cal.4th 939, our Supreme Court considered the factors the court identified in *Bolger*, *supra*, 463 U.S. 60, along with other relevant United States Supreme Court precedent and crafted a "limited-purpose" test for identifying commercial speech. The test applies when, as here, "*a court must decide whether particular speech may be subjected to laws aimed at preventing false advertising or other forms of commercial deception.*" (*Kasky,* at p. 960.) The court directed that a court faced with such a decision should consider "three elements: the speaker, the intended audience, and the content of the message." (*Ibid.*)

The court in *Kasky* applied those factors to the allegations that the defendant, Nike, made false statements about labor practices in its own business operations. (*Kasky*, *supra*, 27 Cal.4th at pp. 969–970.) The court held that these alleged statements constituted commercial speech that was actionable under California's consumer protection laws. (*Ibid.*)

**b.** *Appellants' Challenged Statements*

Applying the three-factor test for identifying commercial speech described in *Kasky,* we conclude that Appellants' challenged representations were noncommercial speech.

As discussed above, the first two factors—the speaker and the intended audience—both suggest a commercial purpose. Appellants were "engaged in commerce" in making representations on the Album Cover and on the Promotional Video to sell the album. (*Kasky, supra,* 27 Cal.4th at p. 963.) And the audience for those representations was potential purchasers of the album. (*Id.* at p. 964.)

30

However, the third factor—the *content* of the challenged speech—shows that the speech at issue here is critically different from the type of speech that may be regulated as purely commercial speech under *Kasky*. That is so for two reasons. First, Appellants' Challenged Statements concerned a publicly disputed issue about which they had no personal knowledge. Second, the statements were directly connected to music that itself enjoyed full protection under the First Amendment.

### i. *Personal knowledge*

The court in *Kasky* explained that, "at least in relation to regulations aimed at protecting consumers from false and misleading promotional practices, commercial speech must consist of factual representations about the business operations, products, or services of the speaker (or the individual or company on whose behalf the speaker is speaking), made for the purpose of promoting sales of, or other commercial transactions in, the speaker's products or services." (*Kasky*, *supra*, 27 Cal.4th at p. 962.) This requirement relates directly to the reasons for denying First Amendment protection to false or misleading commercial speech. As the court explained, the United States Supreme Court "has stated that false or misleading commercial speech may be prohibited because the truth of commercial speech is 'more easily verifiable by its disseminator' and because commercial speech, being motivated by the desire for economic profit, is less likely than noncommercial speech to be chilled by proper regulation." (*Ibid.*, quoting *Virginia Pharmacy*, *supra*, 425 U.S. at p. 772, fn. 24.)

These factors were important for the court's ruling. The court in *Kasky* ascribed great significance to the fact that, "[i]n describing its own labor policies, and the practices and working

31

conditions in factories where its products are made, Nike was making factual representations about *its own business operations.*" (*Kasky*, *supra*, 27 Cal.4th at p. 963, italics added.) The court concluded that "Nike was in a position to readily verify the truth of any factual assertions it made on these topics," and that commercial regulation was "unlikely to deter Nike from speaking truthfully or at all about the conditions in its factories." (*Ibid.*)

Here, Appellants' representations about the identity of the lead singer on the Disputed Tracks did not concern their own business operations or a fact of which they had personal knowledge. Serova alleges that the Cascio Defendants, not Appellants, "jointly created, produced, and recorded the initial versions" of the Disputed Tracks. She claims that the "lead vocals on these songs were performed by another singer under the direction, and with the knowledge, cooperation, participation, and substantial assistance of the Cascio Defendants." And she further alleges that the Cascio Defendants had "*exclusive knowledge* of the fact that Jackson did not perform the songs." (Italics added.)[10]

As discussed above, Appellants' Challenged Statements in the Promotional Video and on the Album Cover concerned an

---

[10] As mentioned above, the parties stipulated below for purposes of the anti-SLAPP motions that Michael Jackson did not sing the lead vocals on the three Disputed Tracks. Accordingly, for purposes of their appeal, Appellants state that they accept "that Jackson did not sing the lead vocals" on the Disputed Tracks. However, Appellants did not stipulate that they *knew* the identity of the singer.

issue of public interest and debate—whether the three Songs on the Disputed Tracks should be included in Michael Jackson's body of work. Appellants did not record the Songs and, according to Serova's allegations, were themselves deceived about the identity of the singer. Appellants' statements therefore lacked the critical element of personal knowledge under the *Kasky* standard.

As the trial court correctly concluded, Appellants' statements directly addressing the public controversy about the identity of the singer—including the Weitzman Statement—were noncommercial. The Challenged Statements on the Album Cover and the Promotional Video also staked out a position in that controversy by identifying the singer as Michael Jackson. The fact that those statements were made in the context of promoting the album does not change their constitutional significance.

Economic motivation is only one of the factors, insufficient in itself, that may indicate that speech is commercial. (*Bolger, supra,* 463 U.S. at p. 67.) As our Supreme Court explained in *Kasky,* whether speech is commercial or noncommercial should take account of the *reasons* for affording commercial speech less constitutional protection. (*Kasky*, *supra*, 27 Cal.4th at pp. 958, 965.) The court in *Kasky* recognized that the speech at issue in that case—Nike's statements about labor practices in the factories that manufactured its products—addressed an issue of public interest. The reason that Nike's speech could be subject to regulation under the state's unfair competition and false advertising laws was that it concerned facts about Nike's own business operations, which were " 'more easily verifiable' " and " 'less likely to be chilled by proper regulation' " than other speech about the publicly debated issue of international labor

practices. (*Id.* at pp. 965, 967, quoting *Virginia Pharmacy, supra,* 425 U.S. at p. 772, fn. 24.) The court cautioned that it did not purport to decide whether speech should be considered commercial if all of the factors that the court identified— including the element of personal knowledge about one's own business operations—were not present. (*Kasky*, at p. 964.)[11]

The absence of the element of personal knowledge is highly significant here. Because Appellants lacked actual knowledge of the identity of the lead singer on the Disputed Tracks, they could only draw a conclusion about that issue from their own research and the available evidence. Under these circumstances, Appellant's representations about the identity of the singer amounted to a statement of opinion rather than fact.[12] (Cf.

---

[11] For example, the court might well have reached a different conclusion in *Kasky* if the statements at issue concerned the labor practices of an independent commercial supplier who simply sold products to Nike for resale. The court specifically noted that Nike had entered into a memorandum of understanding assuming responsibility for its subcontractors' compliance with local labor laws. (*Kasky, supra,* 27 Cal.4th at p. 947.)

[12] In her petition for rehearing following our prior opinion, Serova argued that Appellants' Challenged Statements on the Album Cover and in the Promotional Video were statements of fact, not opinion, because consumers would have understood them to be factual assertions about the identity of the lead singer of the songs in the album. This argument misunderstands the issue. The question here is not whether Appellants have a defense to Serova's claims because their Challenged Statements were truthful assertions of opinion rather than alleged false statements of fact. In that context, focus on the listener's

34

*Bernardo v. Planned Parenthood Federation of America* (2004) 115 Cal.App.4th 322, 348 [statements of opinion on Planned Parenthood's Web site concerning scientific research about abortion and breast cancer were not commercial speech].)

The lack of personal knowledge here also means that Appellants' Challenged Statements do not fit the definition of speech that is " 'less likely to be chilled by proper regulation.' " (*Kasky, supra,* 27 Cal.4th at p. 965, quoting *Virginia Pharmacy, supra,* 425 U.S. at p. 772, fn. 24.) The "regulation" at issue here is the UCL and the CLRA. Serova could obtain relief under these consumer protection statutes without proof of intentional or willful conduct. (See *Kasky*, at pp. 980–981 (dis. opn. of Brown, J.); *Podolsky v. First Healthcare Corp.* (1996) 50 Cal.App.4th 632, 647 [violation of the UCL is a "strict liability

---

understanding is appropriate. (See, e.g., *Baker v. Los Angeles Herald Examiner* (1986) 42 Cal.3d 254, 260–261 [applying a " 'totality of the circumstances' " test in a libel action to determine whether a statement was one of fact or opinion].) Rather, the question here is whether Appellants' challenged speech was commercial. Under the court's analysis in *Kasky*, the *speaker's* knowledge about the content of the speech is the important feature in answering that question. Nike's challenged speech in that case concerned its own business operations, which were within its personal knowledge. (*Kasky, supra,* 27 Cal.4th at p. 963.) That is not the case here, as Appellants were not involved in the initial recordings of the Disputed Tracks. From Appellants' perspective, their Challenged Statements about the identity of the lead singer were therefore necessarily opinion.

35

offense"].)[13]  Thus, to avoid possible liability for a mistaken judgment about the lead singer on the Disputed Tracks, Appellants would have needed to either:  (1) provide disclaimers about the singer's identity in its marketing materials; or (2) omit the Disputed Tracks from the album.[14]

The chilling effect of the second option is obvious.  But the first option also has First Amendment implications.  The United States Supreme Court has emphasized the potentially problematic nature of regulations that compel speech, even in a commercial context.  In *National Institute of Family & Life Advocates v. Becerra* (2018) ___ U.S. ___ [201 L.Ed.2d 835] (*Life Advocates*), the court held that a California law requiring notices in health care clinics concerning available health care services, including abortion, likely violated the First Amendment.  The court declined to recognize an exception to strict scrutiny review

---

[13] The CLRA does provide for a good faith defense to an action for damages, but the defense requires proof of "appropriate correction, repair or replacement or other remedy of the goods and services."  (See Civ. Code, §§ 1782, subds. (b) & (c), 1784.)  In contrast to the consumer claims asserted against Appellants, Serova's fraud claim against the Cascio Defendants of course does include a scienter element.  That claim is still pending in the trial court.

[14] The record illustrates this dilemma.  During oral argument, the trial court suggested that Appellants could have avoided legal challenge by leaving the Songs at issue off the album entirely.  The trial court's written ruling also observes that Appellants could have given the album "a different title and look" or elected "not to attest to the authenticity of the recordings on the cover or in a commercial."

under the First Amendment for "professional speech," noting that the court has permitted compelled disclosures only in the context of professionals' "commercial advertising" concerning " 'purely factual and uncontroversial information about the terms under which . . . services will be available.' " (201 L.Ed.2d at p. 848.) By compelling a particular disclosure, the law at issue amounted to an impermissible "content-based regulation of speech." (201 L.Ed.2d at p. 846.)[15]

By compelling disclosure of the controversy over the Disputed Tracks to avoid liability, the UCL and CLRA would, in effect, require Appellants to present views in their marketing materials with which they do not agree.[16] The possibility that

---

[15] That the court's reasoning in *Life Advocates* has implications beyond just professional disclosures is shown by Justice Breyer's dissent, which cautions that "the majority's view, if taken literally, could radically change prior law, perhaps placing much securities law or consumer protection law at constitutional risk, depending on how broadly its exceptions are interpreted." (*Life Advocates, supra,* 201 L.Ed.2d at p. 857 (dis. opn. of Breyer, J.).) The majority countered by stating that it does not "question the legality of . . . purely *factual and uncontroversial* disclosures about commercial products." (201 L.Ed.2d at p. 852, italics added.) Here, any compelled disclosure would not be "uncontroversial"; Serova herself alleges that "controversy has surrounded" the three Disputed Tracks. Nor would it be "purely factual" from Appellants' perspective, as they had no personal knowledge of the facts.

[16] In her supplemental brief following transfer from the Supreme Court, Serova suggests another alternative. She argues that Appellants could have simply disclosed their "lack of certainty" about the identity of the singer, for example by stating

37

applying these unfair competition and consumer protection laws to Appellants' speech would have the effect of chilling the content of that speech—whether by preventing the sale of particular musical works or by regulating the expression of a point of view on a public controversy about those works—is a further reason to conclude that the speech at issue was noncommercial.

### ii. *The relationship between the Challenged Statements and the art that they promoted*

Appellants' statements in the Promotional Video and on the Album Cover described and promoted the album, of which the Disputed Tracks were a part. The music on the album itself is entitled to full protection under the First Amendment. (*Stewart*, *supra*, 181 Cal.App.4th at p. 682.) The Challenged Statements therefore related directly to a piece of art that has independent significance under the First Amendment.

The identity of a singer, composer, or artist can be an important component of understanding the art itself. No one could reasonably dispute that knowing whether a piece of music was composed by Johann Sebastian Bach or a picture was painted by Leonardo Da Vinci informs the historical

that the " 'lead vocals are *believed* to be by Michael Jackson.' " This alternative still has the effect of compelling speech that is not "purely factual and uncontroversial." (*Life Advocates, supra,* 201 L.Ed.2d at p. 852.) Such a statement implies the existence of real controversy or doubt about the identity of the singer even though Appellants might not believe that any reasonable doubt exists.

understanding of the work.[17]  Similarly, although the art at issue is contemporary and in a different genre, whether Michael Jackson was actually the lead singer of the songs on the Disputed Tracks certainly affects the listener's understanding of their significance.  Thus, the marketing statements at issue here are unlike the purely factual product or service descriptions constituting commercial speech in cases that Serova cites.  (See *Benson v. Kwikset Corp.* (2007) 152 Cal.App.4th 1254, 1268 [representation that products were manufactured in the United States]; *Peel v. Attorney Disciplinary Comm'n of Ill.* (1990) 496 U.S. 91, 99–100 [advertisement concerning attorney's certification as an expert]; *Rubin v. Coors Brewing Co.* (1995) 514 U.S. 476, 481 [descriptions of alcohol content on beer labels].)

We do not suggest that the Challenged Statements here are noncommercial speech *only* because they promoted an art work. We agree with the court in *Rezec, supra,* 116 Cal.App.4th 135, that advertising is not necessarily excluded from the category of commercial speech simply because it promotes a product that is

---

[17] While these examples are only illustrative, they are not purely hypothetical.  (See Dutter & Nikkhah, *Bach works were written by his second wife, claims academic*, The Telegraph (Apr. 23, 2006) <http://www.telegraph.co.uk/news/uknews/ 1516423/Bach-works-were-written-by-his-second-wife-claims-academic.html> [as of Dec. 16, 2019], archived at <https://perma.cc/6M7P-2EY9>; Sayej, *Artistic License?  Experts doubt Leonardo da Vinci painted $450m Salvator Mundi*, The Guardian (Nov. 20, 2017) <https://www.theguardian.com/ artanddesign/2017/nov/20/artistic-license-experts-doubt-leonardo-da-vinci-painted-450m-salvator-mundi> [as of Dec. 16, 2019], archived at <perma.cc/K66L-J3H8>.)

itself subject to full First Amendment protection.  In *Rezec*, the court held that film advertisements that featured fictional endorsements from a nonexistent critic was commercial speech. The court rejected the "absolutist approach" that "because the films themselves are noncommercial speech, so are the advertisements." (*Id.* at p. 142.)[18]

Such an approach would ascribe full First Amendment significance to any commercial representation about a piece of art, no matter how mundane or willfully misleading.  For example, returning to the hypothetical advertisement mentioned above, there is no apparent reason why a statement falsely stating that a particular song is included in an album should be subject to full First Amendment protection simply because the statement promotes the sale of music.[19]  However, where, as

---

[18] In *Keimer*, the court concluded that advertisements repeating "verifiably false or misleading" statements about investment returns contained in a book were commercial speech despite the fully protected status of the books themselves under the First Amendment. (*Keimer*, *supra*, 75 Cal.App.4th at p. 1231.)  The statements at issue here were not "verifiably false" based upon the information available to Appellants, so we need not consider this holding.

[19] Thus, we do not accept Appellants' suggestion that an advertisement promoting a particular piece of art is *necessarily* "inextricably intertwined" with the First Amendment content of the art itself simply because it makes a representation about the identity of the artist. (See *Riley, supra,* 487 U.S. at p. 796.)  The distinguishing features here are that:  (1) the identity of the artist was itself an issue of public discussion and interest; and (2) Appellants had no personal knowledge of the issue.

here, a challenged statement in an advertisement relates to a public controversy about the identity of an artist responsible for a particular work, and the advertiser has no personal knowledge of the artist's identity, it is appropriate to take account of the First Amendment significance of the work itself in assessing whether the content of the statement was purely commercial.

This conclusion is consistent with the flexible approach that the United States Supreme Court has adopted for identifying commercial speech. In *Bolger*, the court explained that no single factor that it identified as a marker of commercial speech is sufficient in itself to classify particular speech as commercial, nor must each factor "necessarily be present in order for speech to be commercial." (*Bolger*, *supra*, 463 U.S. at p. 67, fn. 14.) The court concluded that the presence of all three factors in that case "provides strong support" for the conclusion that the informational pamphlets at issue were commercial. (*Id.* at p. 67.) However, citing a prior opinion involving the advertising of religious books, the court also cautioned that "a different conclusion may be appropriate in a case where the pamphlet advertises an activity itself protected by the First Amendment." (*Id.* at p. 67, fn. 14.)

That is the situation here. The Challenged Statements in the Promotional Video and on the Album Cover concerned music that is "itself protected by the First Amendment." (*Bolger, supra,* 463 U.S. at p. 67, fn. 14.) While not itself dispositive, the fact that the Challenged Statements promoted a piece of art is appropriate to consider in assessing the *content* of the speech under the *Kasky* guidelines. (*Kasky, supra,* 27 Cal.4th at p. 961.)

### 3.    *Conclusion*

Appellant's Challenged Statements on the Album Cover and in the Promotional Video were noncommercial speech outside the scope of the consumer protection claims that Serova asserts against Appellants.  As a matter of law Serova therefore cannot show a likelihood that she will prevail on her claims under prong two of the anti-SLAPP procedure, and her claims against Appellants must be stricken.  We therefore need not reach the issue of whether the Challenged Statements would be misleading to a reasonable consumer.

We emphasize that this holding is based on the record in this case and the issues that have been appealed.  The Cascio Defendants have not appealed, and our holding therefore does not reach any portion of the trial court's order with respect to them.  Nor do we purport to decide whether statements in another context concerning the marketing of creative works might constitute commercial speech.

## DISPOSITION

The trial court's order is affirmed in part and reversed in part. The portions of the Complaint alleging claims against Appellants are ordered stricken. In all other respects the trial court's order is affirmed. Appellants are entitled to their costs on appeal.

CERTIFIED FOR PUBLICATION.


LUI, P. J.

We concur:


CHAVEZ, J.


HOFFSTADT, J.